(Clark County, Probate Court.)

W. S. THOMAS et al. v. BOARD OF COUNTY COMMISSIONERS & W. W. WILSON et al.

---

(1). The construction of drains is an exercise of the police power of the state, and the necessity for the same may be determined in such manner as the legislature may direct.

(2). Upon the first two propositions submitted to a jury, it is sufficient if eight of the jurors agree to return a valid verdict in favor or against such propositions.

(3). The overruling or sustaining of a motion for a new trial, for reason of misconduct of the jury, is one which, while it does not rest entirely in the discretion of the trial court, yet does to a very large extent. In considering the same the court should look at the standing and what is known of the parties who make the affidavits.

It should also take into consideration what its eyes bring to its mind, and what it hears during the continuance of the case.

(4). The correct rule seems to be that the party filing the motion must show that he had no knowledge of the alleged misconduct during the continuance of the trial; for the reason that this is a matter peculiarly known to himself, and not generally within the knowledge of the opposite party.

(5). Where the jury in a ditch appeal find against the proposed improvement, the court is of the opinion, although not entirely free from doubt, that the costs of such proceeding must be taxed against the county commissioners.

---

ROCKEL, J.

The defendants have filed their motion for a new trial, alleging a number of errors, one of which is, that the jury failed to agree, and another which has reference to the same subject—that no verdict has been rendered herein.

This matter has not been seriously argued to the court. It is claimed, however, that because nine of the jurors returned a verdict finding that the ditch was not conducive to the public health, convenience or welfare, and three jurors held otherwise, that this was in substance not a finding against these propositions, but was a disagreement of the jury, and that therefore it should be tried by to another jury, the same as in a disagreement in any other case.

It looks to me however, from the language of the statute, that this was not a disagreement of the jury. It is provided that upon these two propositions, to-wit: Whether said ditch will be conducive to the public health, convenience or welfare, and whether the route thereof is practicable, it should be necessary for only eight jurors to agree.

These are questions which by our constitution are not required to be tried by a jury, and therefore they are not such as would require under the law, unanimity of the entire twelve to find a verdict thereon.

The construction of drains is an exercise of the police power of the state, and the necessity for the same may be determined in such manner as the legislature may direct.

The legislature might have made the finding of the board of county commissioners conclusive upon this matter. But the board of county commissioners not being versed in law, the legislature deemed it wise that these matters might be submitted to a jury presided over by a judge. But it also deemed it wise not to require an agreement of the entire twelve to render a verdict. This was following out the now generally accepted belief that in all civil cases, an entire unanimity of the entire jury should not be required to render a verdict, but which cannot be applied in Ohio to civil cases generally, because the same would be an infraction of a constitutional provision. Our statute does not say that eight must agree in favor of these, two propositions before there can be a verdict received, and that nothing less will be a final determination of the matter. I think therefore, that the finding in this case is not such as would warrant the court in granting a new or re-trial: in other words, that it is sufficient to find either for or against the proposed improvement, that eight jurors should agree.

The other matter which has been most strenuously argued is that the jury had been guilty of misconduct—that four of the jurors during the trial conducted themselves improperly. The first one I will consider is that of Chas. Laybourn. It is said that Charles Laybourn is the adopted son of a cousin of one of the defendants in this case, and while it would not be such a relationship as would have excluded him from service on the jury, yet the defendants claim that they had a right to know it so that they might have exercised or excused him by peremptory challenge if they so desired.

In reply to this matter Mr. Layburn says in his affidavit, that he did not know that he was the adopted child and does not now know that he is an adopted child of a relative of the said plaintiff Dr. A. W. Laybourn, and that he never knew Dr. Laybourn until this trial. It seems to me that this is not sufficient ground to grant a new trial. If he would have known his relationship, it would have been his duty to disclose it.

The next juror whose conduct will be considered is that of Christian C. Kuqua. The facts as near as I can ascertain them in reference to this juror's misconduct, are, that while on the view he met one of the plaintiffs and had some conversation with him about the lay of the land and the flow of the water thereon. Mr. Kuqua and Mr. Crabill, the plaintiff, with whom the conversation was had, both allege in their affidavits, that until that time, they were not acquainted with each other, and did not then know the position they occupied in reference to this trial.

Mr. Kuqua states that they had gone over the route of the ditch, some seven miles in length, and being a man of 70 years of age he lagged behind the others a distance of seventy or a hundred feet, when he met a man cutting willows, and asked him whose land that was, pointing in a certain direction, and why it was not farmed. The man replied, giving the name of the owner and the reason that it could not be farmed that the water banked over it, and it was too wet.

The sheriff observed this conversation and immediately went over to Mr. Crabill, and said to him that this man was a juror, and he ought to have no conversation with him. I do not see how this misconduct, if such it may be called should be attributed to any fault of either plaintiffs or defendants in this case, or that it had any particular influence upon the mind of the juror, such as would warrant the court in setting aside the verdict. There does not seem to have been anything intended wrongfully on the part of the defendant or the juror in this conversation. It was a casual meeting, and it does not appear that Mr. Crabill knew that the jury were then viewing the premises. This then brings this matter within the principal laid down in the case of Armleder v. Liebermon, 33 Ohio State, page 77, where it is said, "There are many questions on this subject reported in the books. The rule most clearly established by the

cases appears to be that, however improper the conduct of the juror may have been, yet if it does not appear to have been in any degree occasioned by the prevailing party, or any one in his behalf, and indicates no improper motive or bias in the mind of the juror, and the court cannot discover that it either had ₔr probably might have had an effect unfavorable to the party asking for a new trial, the verdict should be disturbed. The misconduct of the juror in a civil case, which would render it necessary to set aside a verdict and grant a new trial, should be of such a character as to evidence bad intention. Wright v. Birchfield, 3rd Ohio, 53). The conduct of this juror was reprehensible, but evinced no bad intention". And further on in the opinion the court say: "While the conduct of the juror was clearly improper and such as would ordinary call for an animadversion of the court, we wholly fail to discover from the testimony such misconduct as prevented a fair trial or honest verdict.

"A different ruling would not operate justly. It would punish an innocent party for no offence of his. When the juror is guilty of violating both oath and duty, by improper conduct, he should be made to answer and not an innocent party in no way accessory to the misconduct of the juror.

"Upon the whole, we think the rule that will best secure the desired result, would be, that, in cases where the irregularity or misconduct of the jurors appeared to have operated in favor of the successful party and, as a necessary consequence, to the prejudice of the unsuccesssful party, a new trial should be granted.

"On the other hand, where it appears that it has produced no such result, the verdict should be permitted to stand."

The principles of this case are applicable to the one at bar. Neither Mr. Kuqua or Mr. Crabill had any intention to commit a wrong, and in fact Mr. Crabill did not at the time know that Mr. Kuqua was a juror. It is true that Mr. Kuqua was instructed by the court that he should have no conversation with anyone, but I think the true spirit of the law to be that ʟot every slip of the jury should justify a court in setting aside a verdict.

Jurors ought to be treated as reasonable men. They ought not to be considered with a degree of suspicion. It should be presumed that they would obey the admonitions of the court, and that as reasonable and sensible men, they would not allow themselves to get in a position that might unjustly influence their verdict.

The next matter to be considered is the conduct of Andrew Goodfellow and one of the plaintiffs, H. H. Tuttle. It is shown that during the continuance of this trial, H. H. Tuttle, who is a distant relative of Andrew Goodfellow, rode out to his sister-in-law's house some three or four miles in the country with Mr. Goodfellow. It is alleged that during this ride, some conversation was had in regard to this ditch. One George W. Yaezell, who rode with them, says that Mr. Goodfellow made some remarks to him how the jury would stand upon the trial of this case, and that Mr. Tuttle and Mr. Goodfellow talked about this ditch during the ride. This matter is denied so far as they are concerned in having had a conversation, by both Mr. Goodfellow and Mr. Tuttle.

(2). The overruling or sustaining of a motion for a new trial for reason of misconduct of the jury is one which, while it does not rest entirely in the discretion of a trial court, yet does to a very large extent. In considering the same the court should look at the standing and what is known of the parties who make the affidavits. It should also take into consideration what its eyes bring to its mind, and what it hears during the continuance of the case.

Mr. Goodfellow appeared to the court during the trial of this case, as a conscientious juror. He tried to be excused from service, but remained upon the suggestion of the court that it was his duty to serve as a juror if possible. He came to the court once during the trial of this case, and made inquiry how they were to ascertain the amount of land to be taken by this proposed improvement, and whether, as the same had been omitted by counsel, he might not interrogate the witness on the stand, in reference to this fact.

I merely allude to this to show that it seems to the court that Mr. Goodfellow was endeavoring to honestly perform his duty as a juror, and that he would obey the admonition of the court. Mr. H. H. Tuttle is a minister of the gospel, and a man of the highest standing and reputation, and one whom I can hardly believe would for any consideration falsify himself in his affidavit. There are but two sides to this question, the conversation was either had or it was not had. Without saying anything particularly derogatory of Geo. W. Yeazell, the court is not ignorant of the fact that he sometimes indulges in intoxicants and talks to a considerable degree.

It seems to me that taking into consideration all of these facts, and giving to the jury that credit which men occupying such positions ought to be entitled to, and considering the testimony produced in the affidavit that, while perhaps Mr. Tuttle placed himself in a suspicious position by riding with Mr. Goodfelow, yet it is not such misconduct on the part of either party as would warrant the court in setting aside the verdict. Mr. Tuttle was only one of some twelve parties plaintiff in the case.

An interesting question presents itself. The defendant does not allege or prove in any of his affidavits in support of his motion for a new trial that the alleged misconduct occurred without his knowledge during the continuance of the trial. It is well settled in law that the verdict of a jury will not be set aside by reason of the misconduct of any juror if the party making the motion

has knowledge of such misconduct during the continuance of the trial. But whether this is a matter that must be shown by the party moving the court for a new trial, or the party in opposition thereto, seems not to be fully settled.

The correct rule however seems to be that the party filing the motion must show that he had no knowledge of the alleged misconduct during the continuance of the trial; for the reason that this is a matter peculiarly known to himself, and not generally within the knowledge of the opposite party.

The next question to be considered is as to the taxation of the costs. The petitioner insists that they should be taxed against the board of county commissioners, and argues that the commissioners having found that the ditch was necessary, and that it was conducive to the public health, convenience and welfare, that thereby the construction of the proposed improvement became a public matter—one in which the public at large was interested; that this improvement could only be made, in any instance, for the interest of the public, and when conducive to the general welfare; that although a petitioner, his interest as a private citizen ceased when the commissioners granted the prayer of his petition. And that whatever interest he thereafter had in these procedings, was only as a member of the public at large, and one whom the law might presume to be desirous of seeing carried into successful execution that which he was instrumental in placing in motion. That it was because of this supposed interest in the matter that he was made a party defendant, and not for the purpose of making him an adversary party in the proceedings, and liable to a general law of costs.

There is much force in the position taken by the petitioner and the principle contended for by him.

The difficulty is found in appliyng this principle to the language found in section 4470, R. S., which provides:

"The probate judge shall receive the verdict of the jury, and make a record thereof, together with the proceedings before him, and shall thereupon tax the costs in favor of the prevailing party, and against the losing party; if more than one matter is appealed from and a party prevail as to one, and loses as to another, the court shall determine how much of the costs such party shall pay; but the costs on motions, continuances, and the like shall be taxed and paid as the court may direct.

"If there are several parties, upon the side taxed with costs, the court shall apportion the costs equitably between them. Said judge shall, immediately after the trial, make a transcript thereof, certify and transmit the same, together with all the papers in the case, with the bill of costs made in the probate court, to the auditor of the county, who shall thereupon notify the commissioners to meet at the auditor's office within five days from the date of the notice to determine the matters growing out of the appeal and verdict. (78 v. 206.)

The language here found would seem to require in a case like the present, where the county commissioners and the petitioner and defendants are the losing party, that the court should appropriate the costs between them.

The proper construction to be placed upon a statute is often found in the consideration of the statute which it amends or is intended to supply. In this way the intention of the legislative mind may, at least, to a certain degree, be ascertained. I have frequently found it a very good way of arriving at a satisfactory conclusion.

The act of 1871, (O. L. 68, p. 60), seems to have been a codification of the ditch laws up to that time.

Section 6 of that act provides that the probate judge should docket the case "entitling said case the appellant, plaintiff, and the county commissioners defendant." And further that it was the duty of the appellant to notify the principal petitioner of the time fixed for hearing the cause by the probate judge.

In section 8 of this act it was provided that if the report of the jury be against the appellants, all the costs of appeal shall be taxed against said appellants.

And by section 9 "If the jury shall report against the location of such ditch, the costs made before the commissioners shall be taxed against the principal petitioner". It will be observed that these sections only provide who shall pay the costs of an appeal where the report of the jury is against the appellants.

It is singular that there is no provision as to whom the costs of the appeal shall be taxed, in case the jury report against the improvement. Therefore under the general rule that the costs are to be taxed in favor of the prevailing party and against the losing party, and from the further fact that this statute specifically provided against whom the costs should be taxed in case the jury reported against the appellants, in case the jury reported against the ditch, the county commissioners, the only party defendant, so made by statute, would have been required to pay the costs of the appeal. All that could be taxed against the principal petitioner would have been the costs before the commissioners."

When the statutes were codified in 1880, section 6 became 4464, and it was provided that the probate judge should docket the case, styling the appellants plaintiff and the county commissioners and the petitioner, defendants.

The change made the petitioner defendant, and thus brought him into court, without further notice being required to be given him. And this seems to have been the real purpose for making him a defendant. For, while he was made a defendant in the case, it was specifically provided by section 4471, "that if the jury find the improvement is

not necessary, or will not be conducive to the public health, convenience or welfare, or is not practicable, the commissoners shall cause an entry to be made upon their journal dismissing the proceedings at the costs of the county, which shall be paid out of the general county ditch fund, on the order of the auditor.'

By the act of 1881 (78 O. L., 204) this section 4471, was repealed, and its provisions as to the payment of costs embodied in sections 4470 and 4472 amended in their present form. Until the law was amended in its present form, there was no question but what the costs of a ditch appeal in case the jury found against the decision of the county commissioners, would have had to have been paid by the county. Sec. 4470 as now amended provides how the costs should be taxed in all cases of ditch appeals. You may say it is the general law upon that subject, a gathering up of a number of separate provisions into one systematic whole.

Until section 4470 was made in its present form there was no discretion as to how the costs should be taxed where the jury might on some of the four questions find in accord with the decision of the commissioners and on others not. The jury might find that the ditch is conducive to the public health, convenience or welfare, and that the route thereof is practicable, but upon the question of compensation and damages it is quite probable that upon one or the other, or both, where there were a number of appellants, the verdict of the jury might not agree with the decision of the commissioners.

There might be a number of instances where upon some one of the four questions, there would be two or more parties upon the side taxed with costs. But unless it is held that the petitioner is liable, under this amended section to a part or all of the costs, in a case like the one at bar, section 4407 makes no new party liable for costs.

A defendant petitioner is nowhere specifically made responsible for costs. In making such a general provision, it is fair to presume that the legisiature, in the absence of a contrary specification, did not intend to change the law, and make a new party liable.

It was hinted in Miller v. Weber, 1 O. C. C., 130, that there was a doubt whether a petitioner defendant in a ditch appeal is an adversary party.

Taking all these facts into consideration, the apparent reason why the petitioner was made a party defendant, the fact that it was never anywhere specifically provided that he should pay any of the costs in a ditch appeal, but that on the contrary it was provided that the county should pay them, the doubt whether he is an adversary party or not, the peculiar nature of the proceedings, the interest of the public in general therein, I am inclined to believe, although not entirely free from doubt, that where the jury in a ditch appeal find against

the ditch the costs of such proceedings must be taxed to the county commissioners.

Of course, this would not include costs of motions, continuances, etc., but as in the present case the petitioner has born all the expenses of procuring counsel and preparation of the case, such costs will be held to follow the other costs in the case.